Hill, P. J.
This is an appeal from a decree of the Madison County Surrogate’s Court in a proceeding brought following a compulsory accounting, to determine the liability of the surety under the Surrogate’s Court Act (§ 115-a), wherein the appellant, American Surety Company is directed to pay to Theodore E. Carpenter, substituted trustee under the will of J. Fairfield Carpenter, $164,641.44 and $3,696.30, the latter item being one half of the amounts allowed various attorneys on the final accounting.
The testator died in 1901. His will made specific bequestr of $50,000 to his wife Elizabeth, and $25,000 to each of his three children, Henry, Fairfield II and Theodore. The remainder was placed in a trust fund with the income payable as follows: “ One-half to my said wife Elizabeth during her
natural life and the other one-half to my said wife during her natural life and the minority of all of our children but as each of such children becomes twenty-one years of age I will and direct that this second half of the income from this Trust estate . be divided into as many equal parts as there may be children of mine then living or children of mine who have died prior *74 to that time leaving lawful issue them surviving, and that one such part shall be paid to each of such children who is over twenty-one years of age or to the lawful issue of any of my children who may have died * * * ”. Upon the death of the wife the principal was to be divided among the - surviving children and the issue of those who may have died. The widow was named as executrix. In her account made in 1904 it appeared that .the specific legacies to herself and the children had been paid and the remainder was, by the decree' settling the account, directed to be paid to the Trust & Deposit Company of Onondaga as trustee.
The children of the testator arrived at their majorities as follows: Henry in 1911, Fairfield II in 1914 and Theodore in 1916. The widow died in 1939 survived by Henry and Theodore. Fairfield II had died in 1920 survived by Fairfield III, an infant of about two years, who died in 1927 survived by his mother who has since died. The Onondaga bank remained trustee until 1912 when the widow and. the son Henry were named as successor trustees, with the appellant as surety upon a bond in the penalty of $250,000. • These successor trustees were faithless, and by continuing peculations converted substantially the entire- estate. In June, 1923, they contracted, with the Utica Trust & Deposit Company and Theodore, to turn'over to that banking institution and Theodore, all-of the assets remaining, granting power to handle the trust estate subject only to the laws of the State of Hew York. Following the death of the widow and in 1940, Theodore petitioned for a compulsory accounting by Henry, the surviving trustee. That accounting resulted in the decree of May 3, 1943, which is the basis of this proceeding brought under section 115-a of -the Surrogate’s Court Act to fix the liability of the surety. Theodore’s interest in the corpus, substantially all of which had been diverted by the widow and Henry, was determined to be $84,939.33 with unpaid interest thereon of $67,476.67. It was also determined that the estate of Fairfield III was entitled to $11,626.73 on account of income which should have been paid during the seven years which he survived his father. The aggregate of these amounts, with interest on the first two from March 22, 1943, to May 3d of the same year, the date of the decree, is the amount which it is decreed that appellant shall pay to Theodore, the new successor trustee, together with the counsel fees earlier mentioned;
*75 The appellant asks a reversal upon the following grounds: That Theodore, on March 3, 1917, and after he had arrived at his majority, released appellant from all liability as surety by an instrument executed and acknowledged on that date, and that for some years before he arrived at his majority, and thereafter, had full knowledge of the fact that his mother and brother, the then trustees, were invading and wrongfully using the corpus of the estate, and that he innocently benefited by being supported and maintained; and further, that all claims against appellant are barred by the Statute of Limitations, the latter claim being the only legal objection raised to the amount determined to be payable' to the estate of Fairfield III. As a partial defense, appellant asserts that the amount which it is determined that Theodore is entitled to receive is excessive to the extent of $19,650, being one half of the amount which the widow’s mother paid her for the Washington real estate in part satisfaction of her specific legacy according to her accounts as executrix. The 1943 decree included this real estate in the trust assets. As a further partial defense it is asserted that by a decree of the Madison County Surrogate’s Court made in 1917 upon the consent of all of the interested parties, appellant’s bond dated in 1912 was discharged and reduced to the amount of $125,000.
From 1914, or earlier, Theodore knew that the corpus of the trust fund was being invaded. He says, “ I think many wrong things had been done from the time of my father’s death. Q. Started at the time of your father’s death? A. Yes. ” When Henry became twenty-one years of age in 1911, he communicated with an official of the appellant with whom he or some of his family was acquainted. The letter dated December 29th of that year states, in substance, that a petition had been presented to the Madison County Surrogate for a change of trustee; that Mr. Fitch, the attorney who was handling the matter for the estate, said “ the Surety Co. might wish to counter sign all cheques of the Estate.” The letter continuing says that his mother had asked him to write concerning the counter signature, and he says, “ This arrangement would be very inconvenient for us, and would cause us a great deal of trouble forwarding cheques when travelling, and forcing us to have your signature on everything. The principal reason Mrs. Carpenter and I wish to be appointed Trustees, is so that we will be independent, and have our affairs in our own hands. If it is necessary for you to counter sign all cheques, I see very little advantage in changing the Trustee. *76 Mrs. Carpenter and I do not see why this is necessary.” In a letter in the following month to another "officer of the appellant he writes, “ Mrs. Carpenter and I wish the absolute con-troll [sic] of the Estate and we feel that we are, and can be, responsible for it, in every way. My two Brothers and I are the only beneficiaries of the Principal of the Estate, and they approve of this arrangements [sic], Mrs. Carpenter and I wish to have intire [sic] charge of the principal, the Securities, and the income. We wish cheques valid when signed by us, both for the purposes of income payments, and for investments.” Following this correspondence the mother and Henry were appointed trustees and the appellant furnished their bond in the penalty of $250,000.
In 1914 when Theodore was eighteen years of age, he testifies that he was present at a conversation between the attorney for the estate, Mr. Fitch, and his mother. “ Mr. Fitch came in and was very much distressed and upset and as I recall said that they mustn’t do such things, some of the securities were gone and he was responsible. * * * I would say I had definite knowledge they were spending capital, probably when I was about eighteen.” In 1914 the principal of the estate had been depleted nearly $50,000. About the time that Theodore became twenty-one years of age in October, 1916, he was present at a meeting at the family residence. Mr. Fitch, the attorney, and the mother and Henry then stated that substantially the entire assets of the estate had been dissipated. This Theodore says was untrue, because at about-that time there remained nearly $23,000 of personal property in the form of mortgages, and four pieces of real property, the two that had much value being subject to mortgages. These pieces of real property were those which Theodore says he learned, in 1923, were being “ jiggled * * * Back and forth to get mortgages on them ”, evidently meaning that they were being transferred from the trust estate to .some member of the family. After these disclosures and in March of the following year, Theodore executed a release to the appellant of all matters arising out of the execution of the bond for the faithful performance of the trusteeship by his mother and brother Henry. Shortly thereafter it was reduced by decree of the Madison County Surrogate’s Court to a penalty of $125,000. From this decree no appeal was taken. In January, 1918, while he was at Camp Dix, he wrote his brother that he approved turning the trust estate over to the Columbia Trust *77 Company if Mr. Fitch thought it was satisfactory. In the letter he says, “ I think that the whole family are together in this move. I am very sorry that I can not talk the matters over with you more in detail but I think that we understand each other pretty well. And I hope that you will be able to carry the matter through. I think personally that if we presented the whole case to the Surety Company that they would agree to the arrangement, but I will leave this matter to your judgment.
“ Of course we would want the arrangement with the Trust Company so that they or we could sell any of the real estate (except Lakeland) & you had better ask your lawyer whether this would be possible under the laws governing trusteeships of estates, & under the terms of Father’s Will. ’ ’ In February of the same year, by letter, he recommends that his brother Fairfield buy one of the Cazenovia properties. As to the mortgages upon the property, he says, “ As far as our present mortgages go, I believe that the main trouble has been the delay in the payment .of the interest, & not in the real value of the property. As the Columbia Trust Co. will save that income they get for these payments and attend to them regularly, this objection will be removed.” Further concerning the handling of the small remaining portion of the estate he says, “ For the present & until the estate is returned to a firmer basis I do not believe that we had better try & split the income. I think it will be very hard for Mother to live on at any rate, * * * Mother’s main fault is that she is too generous, & if she has any more money than she needs we need none of us worry, but what we will get our full share. I believe that she is going to live a great deal more carefully, & that she will get on all right.” And in May he again writes, “ I hope that the estate matters will be settled up all right.” In June, 1923, Theodore with his mother and brother contracted with the Utica Trust & Deposit Company. The mother and Henry were still the titular trustees of the estate, and they agreed to “ turn over to parties of the second part [Theodore and the trust company] all of the remaining assets of the trust in their hands, with full authority to parties of the second part to negotiate any sales or exchange of said property or funds ”, and the mother and Henry agreed to execute all transfers which might be requested by Theodore and the bank. The latter agreed to pay all income except that belonging to the infant Fairfield III “ for the support and maintenance of Elizabeth Ten Eyck Carpenter and Annie V. Rogers ”, the latter being the mother of Mrs. Car *78 penter. Theodore testifies concerning his acts thereafter. ' “ Several times I wanted to bring, start proceedings, but my mother and brother were always afraid they would go to jail. And my brother also consulted lawyers. I discussed it. Q. With Henry? A. And my mother. Q. Whenever you had this discussion, they said they were afraid they would go to jail? Á. They remembered what Mr. Fitch’s conversation was and my brother had consulted several lawyers in New York. Q. And as a result of these talks with Henry and your mother, and these talks with the lawyers in New York, you decided you better not do anything about getting the assets back? A. Yes. Q. And yet, and this attitude of not trying to get the assets hack existed until after your mother’s death? A. Yes. Q. Now — A. I was afraid to shock her. She was very old, had heart trouble, was crippled.”
While this appeal is from the decree of January 3, 1945, in the proceeding to fix the liability of the surety under the Surrogate’s Court Act (§ 115-a), the proceedings in the compulsory accounting begun in 1940, including the decree of May 3, 1943, are exhibits. From the latter it appears that included in the deficit found are debit items because of cash received from the Washington real estate mortgages; for negligence in failing to keep that property in proper repair; also items from sales of other pieces of real property which Theodore had approved, as shown in the earlier quoted correspondence. He is permitted to recover for income which he had directed should be given to his mother, both in the letters of 1918 and in the agreement between the trustees on the one hand and the Utica bank and himself on the other, whereunder he, with his nominee the bank, were given full and complete control of all the assets. He signed the release a considerable time after the 1916 discussion with his family and attorney, and away from them in the city where he was employed. He acted deliberately and after full opportunity to reflect upon what he had heard as to defalcations. Some two years later, in a letter earlier quoted herein and after more deliberation and opportunity for further information, he said, “ The whole family are together in this move ”, referring to the Columbia Trust Company’s proposal, and his feeling that the surety company had been fair is indicated by the statement, “ I think personally that if we presented the whole case to the Surety Company that they would agree to the arrangement, but I will leave this matter to your judgment.” From 1923 to 1940 when he presented the *79 petition for the compulsory accounting, he and the Utica hank which he had selected had entire control of the estate. His mother and Henry had agreed to account and resign at any time. No person connected with the appellant had threatened criminal prosecution of any member of the family. There is nothing to indicate that any one, particularly on behalf of the appellant, exercised a controlling influence over his will and conduct when he executed the release in 1917. (Adams v. Irving National Bank, 116 N. Y. 606.) It is not material whether he refrained from affirmative action after he went in control in 1923 from something the estate attorney Fitch had said in 1916, or because of his mother’s condition which he describes as follows: “I was afraid to shock her. She was very old, had heart trouble, was crippled.”
Except for the smaller item payable to the infant’s estate, all of the recovery decreed is for his personal benefit, as Henry, the other survivor, has already taken his share by peculation. Theodore is not entitled to recover against the appellant surety, and the decree of the Surrogate in that regard should be reversed.
The Utica Trust & Deposit Company and Theodore exercised complete supervision of the estate after 1923 when the agreement was made giving them the custody and control. The mother and brother, so far as Theodore was concerned, had in fact resigned and surrendered their trusteeship. From that time the statute of limitations ran in favor of the trustees and their surety, as against Theodore’s claim. (Lammer v. Stoddard, 103 N. Y. 672; Spallholz v. Sheldon, 216 N, Y. 205.)
In the amount which the decree directed this appellant to pay on account of the surcharge against the trustees, was an item of $11,626.73, being the share belonging to the estate of the infant Fairfield III on account of his one-sixth interest of the income for the seven years he lived after his father’s death. As to this, appellant asserts that the statute of limitations has run in favor of the trustees. It is not shown that any person on behalf of the estate of Fairfield III had knowledge as to the change of actual management from the trustees to Theodore and the Utica bank, and the statute of limitations did not begin to run against it until Henry, the surviving trustee, was removed following the compulsory accounting decree. The surcharge as far as this item is concerned should be sustained.
*80 The decree of May 3, 1943, in the compulsory accounting awarded costs to various attorneys payable by the estate. The decree from which this appeal is taken modifies the earlier decree by directing that one half of these costs be paid by appellant. The Surrogate was without power to make this change.
In this proceeding, costs and disbursements aggregating $3,997.50 were decreed to be paid to the attorney for the petitioner Theodore. In view of the reduction of the amount of the surcharge, this allowance is excessive and should be reduced to the sum of $1,000 and disbursements.